UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MIKAYLA WEST,

       Plaintiff,

v.

DAVID SHULKIN, ROBERT WILKIE

       Defendants.

_____/

Case No. 17-14218
Honorable Thomas L. Ludington

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

On December 29, 2017, Plaintiff Mikayla West filed a complaint against Defendant David
J. Shulkin, now-former Secretary of Veterans Affairs. ECF No. 1. On June 1, 2018, Plaintiff filed
an amended complaint substituting current Secretary of Veterans Affairs, Robert Wilkie, as
Defendant.[1] ECF No. 16. Plaintiff claims that Defendant and his agents racially discriminated and
retaliated against her for engaging in a protected activity under Title VII by terminating her
employment. *Id.* On May 6, 2019, Defendant filed a motion for summary judgment. ECF No. 27.
For the following reasons, the motion will be granted in part and denied in part.

**I.**

**A.**

Plaintiff Mikayla West is an African-American female who was employed by the U.S.
Department of Veterans Affairs from 2016 to 2017. Plaintiff graduated from Delta College in 2015
with an associate degree and a Practical Nurse certificate. PageID.359 at 11:18-23; PageID.360 at
13:5-8. On December 9, 2015, Plaintiff was licensed as a Practical Nurse by the State of Michigan.

---

[1] Wilkie was officially sworn in as Acting Secretary of Veterans Affairs on March 28, 2018. He assumed office on
July 30, 2018.

PageID.360 at 13:9-16. On February 9, 2016, Plaintiff began her first position with the United States Department of Veterans Affairs at the Aleda E. Lutz VA Medical Center ("Lutz") in Saginaw, Michigan as a Certified Nursing Assistant in the Community Living Center unit. PageID.362 at 23:1-6. Plaintiff held this position until August 2016, when she was hired as a urology and nephrology Licensed Practical Nurse ("LPN") in Lutz' Specialty Clinic. PageID.362 at 24:18-19; PageID.363 at 27:3, 10-12. On August 22, 2016, Plaintiff started her LPN position. PageID.423. Plaintiff initially worked under the supervision of African American Nurse Manager Archia Jackson. PageID.438 at 25:25-PageID.439 at 26:1. When Jackson transferred to a different department, Christina Tokarski, a Caucasian female, was named Acting Nurse Manager for the clinic, before being promoted to Nurse Manager in early 2017. PageID.437 at 20: 21-25.

Plaintiff alleges the work environment "changed" when Tokarski replaced Jackson. PageID.560. Plaintiff alleges that Tokarski was "very close" with LPN Terri Hayes, LPN Susan Sobieray, LPN Ed Marshall, Registered Nurse ("RN") Cathy Stadler, and RN Melissa Pritchard. PageID.561. Dr. Linda McIntyre, an employee in the Specialty Clinic, stated "it was evident" that Tokarski was "good friends" with Pritchard and Stadler. ECF No. 31-8. Plaintiff and Crystal Alexander, an African American RN in the unit, would allegedly hear this group of Caucasian nurses "talk about socializing outside of work together with Tokarski and going to the bar." PageID.561. Plaintiff further testified that she and Alexander were never invited to these alleged social gatherings. ECF No. 31-3 at 42:9-10.

Plaintiff began her orientation period upon being hired. There is no set length for the orientation period, as an LPN must show competency in dozens of procedures before successfully completing orientation. PageID.332. The Lutz facility uses an orientation checklist to train all LPNs, including Plaintiff. PageID.331-32. Non-supervisor peers, called preceptors, help train the

new LPNs, offer feedback, and review and sign off on the checklist's procedures. *Id.* Plaintiff's preceptors were Sobieray, Hayes, Pritchard, and Stadler. PageID.260 at 44:9-13. The checklist included a review sheet, in which the nurse manager or preceptor documented Plaintiff's performance in two-week intervals. PageID.332; PageID.430. After each interval, Plaintiff, the nurse manager, and a preceptor would meet to review and evaluate Plaintiff's progress. PageID.332.

On September 13, 2016, Tokarski reviewed Plaintiff's first two-week period. PageID.430. Tokarski's review was complimentary, noting that Plaintiff was "working independently," picking tasks up easily, "asking question[s]," "getting along well" with others, and was an "asset" to the department. *Id.*

On September 14, 2016, Tokarski and Plaintiff met with Sadler to discuss Plaintiff's progress. PageID.465; PageID.479. Tokarski noted in her calendar entry that she discussed concerns about Plaintiff keeping her door shut, not checking patients in, and constructive criticism. PageID.465. Tokarski's calendar entry also noted that Physician's Assistant Krista Stapleton-Zehnder and Nurse Practitioner Virginia Roland complained about Plaintiff being absent from the work area and reading a book while on her shift. *Id.* Plaintiff's notes from the meeting did not indicate a discussion of Stapleton-Zehnder and Roland's complaints. PageID.467.

On September 27, 2016, Sobieray reviewed Plaintiff's second two-week period. PageID.430. Sobieray addressed several concerns, noting that Plaintiff needs to "keep door open when available" and "complete veterans note while veteran is in the room." *Id.*

On September 29, 2016, Tokarski and Plaintiff met to discuss Plaintiff's progress. PageID.467; PageID.468. Plaintiff's notes from the meeting indicate that Plaintiff told Tokarski that she felt like her co-workers are out to get her. Plaintiff also noted that she felt like she had

multiple managers because "whatever they told [Tokarski,] [Plaintiff] was being sat down [and] talked to." PageID.467. Tokarski's calendar entry similarly noted that Plaintiff "feels she keeps getting in trouble." PageID.468. Tokarski also noted that she told Plaintiff that her "co-workers are there to train her" and "should be telling her ways/things to correct." *Id.*

On October 11, 2016, Pritchard reviewed Plaintiff's third two-week period. PageID.430. Pritchard's review was mixed, noting that while Plaintiff needs "direction," "prompting," and "time management skills," she "seeks out help for new situations." *Id.*

On October 18, 2016, Plaintiff received her Annual Competency Assessment and was marked satisfactory on every skill a validator reviewed on. ECF No. 31-10.

On October 25, 2016, Sobieray reviewed Plaintiff's fourth two-week period. PageID.430. Sobieray's review was mixed, noting that while Plaintiff took "adequate" and "complete" notes and "appropriately" asked questions, she needed improvement "initiat[ing] procedures." *Id.* Sobieray also noted that Plaintiff refused to engage in re-stocking tasks during down time, allegedly saying "that's not my job" and "I'm not doing that." *Id.* Sobieray then noted she told Plaintiff that "it is all our jobs to watch for keeping up on quality care for our veterans." *Id.*

On October 26, 2016, Tokarski met with Plaintiff and Jackson to discuss Plaintiff's progress. PageID.470. Tokarski testified that Jackson requested this meeting after Tokarski told her about concerns of not getting her message through to Plaintiff. PageID.445 at 52:1-12. Tokarski documented the meeting in an email that she sent to Plaintiff the following day. PageID.470-71. The email discussed Plaintiff's September concerns as well as additional concerns about Plaintiff's performance throughout October. *Id.* During the week of October 11, 2016, Plaintiff allegedly failed to follow Tokarski's instructions about her unit assignment. PageID.470. On October 13, 2016, Plaintiff again allegedly failed to follow Tokarski's instructions for

summoning other nurses for assistance. *Id.*; PageID.473. On October 26, 2016, Plaintiff told LPN Ed Marshall that she was not going to do chart reviews after Marshall volunteered to show her the process for doing the reviews. *Id.*; PageID.476. Plaintiff indicated in her notes that she told Marshall she "wasn't ready for that yet." PageID.476. Plaintiff further noted that Jackson told her at the October 26 meeting that she "shouldn't be learning" chart reviews yet. *Id.* Also on October 26, 2016, Plaintiff avoided answering Sobieray's question when she followed up with Plaintiff concerning the prior day's re-stocking tasks. PageID.470-71; PageID.474. Plaintiff indicated in her notes that she did not maintain eye contact with Sobieray because she "was working on something for a veteran at the time." PageID.477. On October 27, 2016, Plaintiff responded to Tokarski's email by stating that she did not "agree with any of this" and "false statements" were being made about her. PageID.479.

On October 28, 2016, Plaintiff spoke at a nurse meeting regarding her treatment and concerns. Plaintiff's notes state that she was aware "certain concerns" had been raised, that she was an "approachable person," and invited her co-workers to approach her with their concerns so she could "fix the issues." PageID.481. Plaintiff further noted that "nobody spoke up." *Id.* Afterwards, Tokarski initiated a meeting with Plaintiff and union chief steward Dan Wilheim. Plaintiff's notes indicate that Tokarski told her that "there is no problem w[ith] the care you provide but your conduct." PageID.482. Plaintiff, Tokarski, and Wilheim all signed a sheet that listed the "expectations of any LPN working in the Specialty Clinic." PageID.483.

On October 31, 2016, Tokarski sent an email to Plaintiff, Wilheim, and Tokarski's supervisor Kathryn Ball documenting the October 28 meeting's events and expectations for the LPN role. PageID.484-85. Tokarski's email noted that Plaintiff shared that she "felt as though [her] co-workers were not approaching" her with their concerns. PageID.484. Tokarski also noted

that she expressed concerns about Plaintiff's conduct, including respecting and communicating with her co-workers, and responding to calls and requests in a timely manner. PageID.485.

Plaintiff also testified that she talked to the union about the events that transpired from the nurse meeting at "the end of October." ECF No. 31-4 at 106:9-10. Plaintiff said she spoke with union representative Robert Pritchard, Melissa Pritchard's husband, and told him she "felt [she] was being picked on." ECF No. 31-4 at 106:16. Plaintiff testified that R. Pritchard told her just to "deal with it." Id. at 19-20.

On November 8, 2016, Tokarski noted in her calendar entry that she spoke with Ed Lesko, Human Resources ("HR") Officer at Lutz. PageID.486. Tokarski noted that she asked Lesko if she could terminate Plaintiff. *Id.* Tokarski further noted that Lesko said there were no grounds for Plaintiff's termination nor could she give Plaintiff's an unsatisfactory review. *Id.*

On November 9, 2016, Plaintiff received a satisfactory review for her overall performance in her 90-day evaluation. PageID.489. Tokarski added a note that stated, "Based on previous conversations, understanding of expectations set forward and will continue with orientation." *Id.*

On December 1, 2016, Tokarski met with Plaintiff and Sobieray regarding Plaintiff's progress. PageID.430. Tokarski noted in her calendar entry that they discussed scheduling follow-up appointments and problems with Plaintiff's charts. PageID.490. Tokarski also noted that she decided to extend Plaintiff's orientation for two weeks. *Id.* Plaintiff's notes from the meeting expressed concerns that Tokarski "wouldn't listen to anything" concerning Plaintiff's explanations for the complaints raised about her. PageID.492. Plaintiff also noted that the orientation extension made her "feel totally discriminated against" because Leanne Strok, a Caucasian LPN, "started with [Plaintiff] [and] has been off orientation for 2 weeks." *Id.*

On December 6, 2016, Tokarski received two complaints regarding Plaintiff's performance. First, Sobieray noted that on December 5, 2016, Plaintiff discharged a veteran in the waiting room, PageID.493, which Defendant contends was a "potential HIPAA violation," PageID.338. Second, Hayes noted that Plaintiff "was standing at the window talking" while a veteran waited to be checked into the clinic. PageID.494.

Also on December 6, 2016, Plaintiff contacted EEO manager Cherryl Biggins at the Lutz facility to complain that she was being harassed by Tokarski based on her co-workers' complaints about her, which she contended created a hostile work environment. PageID.495. Plaintiff asserted that she was "singled out," and "not given the opportunity to give her side of the story" regarding complaints about her performance. Plaintiff further asserted that Strok "started the same time [Plaintiff] did and is no longer in orientation." *Id.*

Plaintiff alleges that the work environment under Tokarski is hostile to African Americans. Joann Gidron, an African American employee in the Specialty Clinic, stated in a January 11, 2017 interview that Plaintiff was excessively monitored by Hayes and Sobieray, something that did not allegedly occur with the other nurses. ECF No. 31-13. Pamela Tasley, another African American employee in the Specialty Clinic, stated in a January 11, 2017 interview that Hayes monitored Plaintiff beyond normal and Sobieray would "pass certain patients off to [Plaintiff] even when she [was] busy with another patient." ECF No. 31-14. Tasley also stated that this was the "first time in 10 years that she has seen a hostile work environment." Brenda Woods, an employee in the Specialty Clinic, stated in a December 28, 2016 interview that Plaintiff's orientation "was going fine and then suddenly other nurses (LPNs) started coming to her complaining about [Plaintiff]." ECF No. 31-15. Woods described Plaintiff as an "excellent LPN." *Id.*

Plaintiff alleges that the "racial dynamic is best characterized" in statements made by Hayes about Plaintiff and Alexander. PageID.564. For example, Plaintiff testified that Hayes mentioned "its us versus them," allegedly "meaning it's the white nurses versus [Plaintiff] and Alexander," and would make comments about Plaintiff and Alexander like "[t]here they go again." *Id.* When speaking to Alexander, Plaintiff testified that Hayes would refer to Plaintiff as "her friend." *Id.* Plaintiff alleges that she told Tokarski several times that Hayes was racially biased against her as an African American, that she felt Sobieray, Hayes, and Ed Marshall were out to get her, and that these actions were being done because she was African American. PageID.567. However, Plaintiff alleges that "Tokarski simply blew off Plaintiff's complaints and changed the subject." *Id.* Plaintiff testified that she spoke with Union President Robert Pritchard about her treatment. Plaintiff alleges that R. Pritchard told Plaintiff "to deal with it." PageID.567.

On December 15, 2016, LPN Michelle McInnis complained about Plaintiff's performance after Plaintiff was asked to cover in the podiatry clinic. PageID.500. McInnis noted that Plaintiff allegedly arrived to the clinic stating "I don't understand why I'm here, I am still on orientation." *Id.* The same day, Tokarski noted in her calendar entry that she spoke to Plaintiff regarding her conduct, noting that "she should be able to go to any clinic while on orientation to cover." PageID.501. Plaintiff testified that Tokarski led her into a stairwell after the incident at the podiatry clinic and told her not to ask questions, allegedly raising her voice and pointing her finger at Plaintiff. PageID.396 at 159:17-160:16. Tokarski also noted in her calendar entry that she spoke to Ed Marshall and Woods about Marshall's refusal to cover podiatry earlier that day. *Id.*; PageID.540-41.

On December 16, 2016, Plaintiff contacted the EEO office to initiate an informal EEO charge. PageID.499. Tokarski stated in her declaration that she first learned about Plaintiff's EEO

complaint on December 16, 2016 when she was invited by Biggins to provide a fact-finding statement.

On December 19, 2016, Plaintiff completed orientation. PageID.430.

On December 20, 2016, Plaintiff signed Biggins' summary of her initial contact on December 6, 2016. PageID.495.

On December 21, 2017, Plaintiff's notes indicate that Hayes first asked Woods, and then Alexander, to speak to Plaintiff about work tasks that Hayes wanted Plaintiff to cover. PageID.503. Plaintiff then noted that Alexander guided her to a room with Sobieray and Hayes and attempted to resolve concerns about Plaintiff's work performance. *Id.* Plaintiff allegedly expressed her concerns about her co-workers excessively monitoring her at work. PageID.504-505. Tokarski testified that she was off that day and that none of the participants discussed it with her afterward. PageID.452 at 79: 6-22.

On December 22, 2016, Hayes emailed a complaint about Plaintiff's performance to Tokarski. PageID.506. Hayes noted that Plaintiff "spends a lot of time behind closed doors or socializing with other staff members, leaving her co-workers to pick up a majority of the work load and not check in the patient[s] in a timely manner." *Id.* Hayes also noted that Plaintiff was taking lunches "when she want[ed]" after being told "lunch breaks [were] to be taken between 12 and 1." *Id.* Hayes complained that Plaintiff "fe[lt] we are all picking on her, which is not true." *Id.*

On December 23, 2016, Plaintiff submitted her Pre-Complaint paperwork stating that she was discriminated against by Tokarski and her coworkers on the basis of race. ECF No. 31-20.

On December 27, 2016, Plaintiff job shadowed Stadler. PageID.507. Stadler complained to Tokarski that Plaintiff was "on her phone texting and checking messages" while Stadler was explaining her RN responsibilities to Plaintiff. *Id.* Also on December 27, Tokarski noted in her

calendar entry that Plaintiff was in the clerk's office talking while patients were waiting to check out of the clinic. PageID.508.

On December 29, 2016, Roland and Stapleton-Zehnder emailed a complaint about Plaintiff's performance to Tokarski. PageID.509-10. They noted that Plaintiff "kept her door closed," was "slow/delayed on checking patients in," "frequently not at her work station," and "working with the RN," which "monopolizes two providers." *Id.* On December 30, 2016, Tokarski forwarded the email to HR. PageID.509.

On January 5, 2017, Janet Massoglia, a nurse practitioner in urology, emailed a complaint about Plaintiff's performance to Tokarski. PageID.511. Massoglia noted a veteran's bladder scan results were "invalid" because Plaintiff failed to follow the correct process for the procedure. *Id.* On January 7, 2017, Tokarski forwarded the email to HR. *Id.*

On January 6, 2017, Sobieray emailed a complaint about Plaintiff's performance to Tokarski. PageID.512. Sobieray noted that Plaintiff told her she would perform a veteran's trial void procedure but never did so, causing the veteran to wait an hour until another nurse started the procedure. *Id.* Sobieray also noted that she instructed Plaintiff on how to handle a similar situation in the future. *Id.* On January 7, 2017, Tokarski forwarded the email to HR. *Id.*

On January 9, 2017, Tokarski participated in her fact-finding interview for Plaintiff's EEO charge. Tokarski stated that "she did not get involved" in the December 21 conversation between Plaintiff, Alexander, Sobieray, and Hayes.

On January 13, 2017, Sobieray emailed another complaint about Plaintiff's performance to Tokarski. PageID.513. Sobieray noted that on January 12, 2017, she asked Plaintiff for assistance in restocking supplies, to which Plaintiff allegedly responded, "Why wouldn't the person who noticed it do it?" *Id.*

Also on January 13, 2017, Biggins sent a memorandum summarizing her investigation of Plaintiff's EEO claim to Ball. PageID.514-18. Biggins explained Plaintiff's allegations and summarized fact-finding interviews she had conducted with fifteen witnesses who worked with Plaintiff and Tokarski, as well as Plaintiff and Tokarski themselves. *Id.* The same day, Biggins emailed Plaintiff and Tokarski that there was to be a mediation on January 31, 2017 regarding Plaintiff's EEO charge. PageID.519-20. Tokarski then emailed Biggins, asking Biggins to explain the email to her, which Biggins did in the third email. PageID.519.

On January 18, 2017, Pritchard emailed a complaint about Plaintiff's performance to Tokarski. PageID.521. Pritchard noted that Plaintiff was not logged into her computer after her shift had begun but was rather "working on personal papers." *Id.* Pritchard further noted in her email that she had a conversation with Plaintiff about her alleged failure to initiate tasks in other sub-clinics when the urology sub-clinic was not busy. *Id.* On January 24, 2017, Tokarski forwarded the email to HR. *Id.*

On January 19, 2017, Plaintiff emailed Tokarski "looking for clarity on who was able to delegate task[s]" to her because she was "running into problems with people delegating task[s] to [her] because they don't want to do a specific task." PageID.522. On January 24, 2017, Tokarski forwarded the email to HR. *Id.*

On January 25, 2017, LPN Robert Rodietcher emailed a complaint about Plaintiff's conduct to Tokarski. PageID.523. Rodietcher noted that Plaintiff was taking overly long lunch breaks. *Id.* Tokarski forwarded the email to HR. *Id.*

On January 27, 2017, Tokarski requested to meet with Plaintiff with a union representative present to allegedly discuss "orientation." ECF No. 31-26. Lesko issued a letter to Plaintiff titled "Termination During Probationary Period." PageID.524-25. Plaintiff responded that she wanted

Tabitha Petty present, a union representative Plaintiff previously corresponded with. *Id.* Petty was not working that day. *Id.* The situation triggered Plaintiff's asthma and Stadler found Plaintiff "at her desk, having a lot of difficulty breathing." ECF No. 31-28. Plaintiff visited the office of Minoo Khetarpal, M.D. on January 30, 2017, who recommended approximately a one week leave of absence for health reasons. ECF No.31-29.

On January 30, 2017, Lesko issued a second termination letter, identical in form to the first letter, to Plaintiff, which was served on her residence. PageID.526-27. The letter stated that when "it becomes apparent that an employee's conduct, general character traits or capacity do not meet the requirements for satisfactory service, the supervisor is required to initiate action to separate the employee." PageID.526. The letter further states that Tokarski "recommended that [Plaintiff] be terminated" for "failure to follow instructions and conduct." *Id.* Tokarski testified that the decision to terminate Plaintiff was made "a week or two before" her actual termination. PageID.270 at 85:1-19.

On December 13, 2017, Director of the Office of Employment Discrimination Complaint Adjudication Maxanne R. Watkin issued the final agency decision on Plaintiff's EEO claims. PageID.528-38. The decision stated that while Plaintiff was assumed to have met the prima facie case for racial discrimination and retaliation, PageID.534, the VA had articulated legitimate, nondiscriminatory reasons for terminating Plaintiff and that those reasons were not pretext for racial discrimination, PageID.535.

**B.**

Plaintiff's amended complaint presents two counts. Count I alleges that Defendant racially discriminated against Plaintiff in violation of Title VII, 42 U.S.C. § 2000e, by terminating her

employment. PageID.108. Count II alleges that Defendant retaliated against Plaintiff for engaging in a protected activity under Title VII by terminating her employment. PageID.109.

## II.

Defendant moves for summary judgment under Fed. R. Civ. P. 56. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party, who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The Court views the evidence, and any reasonable inferences drawn from the evidence, in favor of the non-moving party. *Id.* at 255.

## III.

A plaintiff can establish a prima facie case of race discrimination by relying on direct or indirect evidence of discrimination. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121 (1985); *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 707 (6th Cir.1985). Where a Plaintiff relies on indirect evidence, the *McDonnell Douglas* burden shifting framework applies, and a Plaintiff must show 1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) that adverse employment action occurred under circumstances giving rise to an inference of discrimination. *In re Rodriguez*, 487 F.3d 1001, 1008 (6th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1972). The fourth element of the prima facie case can be established by showing that the plaintiff was replaced by a person outside his protected class, or was treated differently than a similarly situated person of a

different class for the same or similar conduct. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992).

If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory rationale for the adverse employment action. *In re Rodriguez*, 487 F.3d at 1008. Once the employer does so, the burden shifts back to the plaintiff to demonstrate that the articulated reason is a mere pretext for discrimination. *Id.*

### A.

The first two elements of Plaintiff's prima facie case are undisputed as Plaintiff, an African American, is a member of a protected class and suffered an adverse employment action when she was terminated from her position. In addition, Plaintiff has demonstrated a triable issue of fact with respect to the fourth element. When Tokarski was asked in her deposition whether Thomas Cline, a Caucasian male, replaced Plaintiff, Tokarski testified, "Uh-huh" in the affirmative. PageID.275.

Defendant only challenges Plaintiff's ability to satisfy the third element, which is her qualification for the position. PageID.346-47. To satisfy this element, Plaintiff must prove that she was performing "at a level which met [her] employer's legitimate expectations." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990). Defendant contends that Plaintiff "never met the VA's expectations for her position" because, as discussed in detail above, documentation of her performance deficiencies began on September 14, 2016, twenty-two days after her start date. PageID.347. Defendant further supports his contention that Plaintiff was not qualified for the position by stating that the record "shows ten nurses or providers criticizing [Plaintiff]'s performance, and Tokarski counseling [Plaintiff] about those deficiencies throughout [Plaintiff]'s tenure." *Id.*

However, evidence concerning Plaintiff's qualifications must be evaluated "independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline v. Catholic Diocese of Toledo*, 205 F.3d 651, 661 (6th Cir. 2000). To otherwise consider Defendant's nondiscriminatory reason for terminating Plaintiff "would bypass the burden-shifting analysis and deprive the plaintiff of an opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Id.* Defendant admits that Plaintiff was terminated because her "conduct, general character traits or capacity do not meet the requirements for satisfactory service," PageID.524, 526, which he contends was "supported by the extensive documentation in the record." PageID.348. Defendant clarifies in his reply brief that "complaints from co-workers and [Plaintiff]'s unwillingness to respond to criticism from her preceptors and manager" justified her termination. PageID.794. Thus, Defendant used his proffered legitimate nondiscriminatory reason for Plaintiff's termination to also dispute her qualifications for the position. At this stage, Defendant's proffered reasons for terminating Plaintiff are not considered.

"[B]ut for the nondiscriminatory reasons" for terminating Plaintiff, "Plaintiff was qualified for her position." *Blood v. City of Bay City*, 2013 WL 142079 at 14 (E.D. Mich. Jan 11. 2013). Plaintiff's orientation checklist indicates that, despite concerns about her progress, she nevertheless "performed satisfactory in every single portion of her training." PageID.573; ECF No. 31-9. Plaintiff also performed satisfactory in every single category of her Annual Competency Assessment. ECF No. 31 Ex. 9. Similarly, Plaintiff's overall performance in her position was rated as satisfactory on her 90-day follow up evaluation. ECF No. 31 Ex. 10. In addition, several staff members described Plaintiff as "nice, approachable, friendly, respectful, and courteous to both patients and staff" in their EEO statements. ECF No. 31-31 at h. One co-worker, Brenda Woods, described Plaintiff as an "excellent LPN." ECF No. 31-15.

Plaintiff's evidence demonstrates a triable issue of fact regarding her qualifications for the position. Therefore, she has met her burden in establishing a prima facie case for racial discrimination under Title VII.

## B.

Once Plaintiff establishes a prima facie case, the burden shifts to Defendant to proffer a "legitimate, nondiscriminatory reason" for Plaintiff's termination. *Johnson*, 215 F.3d at 573. Defendant contends that Plaintiff was terminated for a legitimate, nondiscriminatory reason because she had "ongoing performance issues and refus[ed] to accept constructive criticism." PageID.347. Plaintiff's termination letter stated that her supervisor was required to terminate Plaintiff's employment when her "conduct, general character traits or capacity [did] not meet the requirement for satisfactory service." PageID.524, 526. The letter further provides that Plaintiff's "failure to follow instructions and conduct" were the reasons for her unsatisfactory service. *Id.*

The Sixth Circuit has determined that "poor performance is a legitimate non-discriminatory reason for [defendant] to terminate [the plaintiff]." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 488 (6th Cir. 2011). Defendant also has statutory authority to terminate Plaintiff for poor job performance because she was still a probationary employee under 5 CFR § 315.801 at the time of her termination. *See* PageID.524, 526; *see also* 5 C.F.R. § 315.802 ("The probationary period required by § 315.801 is 1 year"). Section 315.803 provides that an agency "shall terminate [an employee's] services during this period if [she] fails to demonstrate fully [her] qualifications for continued employment."

The evidence demonstrates that Plaintiff consistently faced performance issues while serving in her position. As discussed in detail above, Tokarski received several complaints from Plaintiff's co-workers that Plaintiff was not performing her duties in a proper and timely manner.

For example, Plaintiff was deemed multiple times to be absent from her work station, untimely in checking patients into the clinic, and refusing to initiate or engage in tasks. These complaints began just twenty-two days after Plaintiff started her position and continued until January 25, 2017, two days before Plaintiff's termination. In addition, Plaintiff was counseled on these issues during her meetings with Tokarski, which is also discussed above, but the complaints nevertheless continued to occur after counseling.

Given the repetitive complaints and Plaintiff's status as a probationary employee, Defendant has met his burden in proffering a legitimate, nondiscriminatory reason for Plaintiff's termination.

## C.

Once a defendant satisfies its burden in proffering a legitimate, nondiscriminatory reason for terminating the plaintiff, the burden shifts back to the plaintiff to demonstrate that the defendant's reason is pretext for racial discrimination. *Johnson*, 215 F.3d at 573. Under Title VII, a plaintiff can demonstrate pretext by showing that the defendant's proffered reasons: 1) had "no basis in fact"; 2) "did not actually motivate" her termination; or 3) were "insufficient to motivate" her termination. *Scuderi v. Monumental Life Ins. Co.*, 344 F. Supp 2d 584, 595 (E.D. Mich. 2004). Plaintiff contends that Defendant's reason for Plaintiff's termination is pretext for racial discrimination because it has no basis in fact and was insufficient to warrant termination. PageID.578-80.

## 1.

Plaintiff first contends that Defendant's proffered reason for her termination is pretextual because it has no basis in fact. Plaintiff argues that the "alleged issues with Plaintiff's availability are easily contradicted by other employees on the floor." PageID.579. For example, LPN Robin

Majewski emailed Tokarski about one month before Plaintiff's termination to inform Tokarski that Plaintiff performed her duties "very well" and "took suggestions well on how she could improve." ECF No. 31-33. Similarly, Woods described Plaintiff as an "excellent LPN" and McIntyre said she had no issues with Plaintiff's work or availability. However, the fact that Plaintiff proficiently performed her job duties on some days alongside certain co-workers does not mean that Plaintiff could not have performed unsatisfactorily on other days with different co-workers. Neither Majewski nor Woods' comments in any way negate or contradict the complaints of other co-workers who expressed concerns about Plaintiff's work on different days and for different tasks.

Plaintiff further argues that Defendant's proffered reason for terminating Plaintiff has no factual basis because some of the nurses who complained about Plaintiff's performance were "close to Tokarski," thus mitigating the credibility of Defendant's decision to terminate Plaintiff. For example, Plaintiff provides statements from co-workers that Hayes and Sobieray monitored Plaintiff "beyond normal" and searched for her when she was absent from her office. However, Hayes' and Sobieray's alleged conduct does not negate their complaints about Plaintiff's quality of work or conduct. Plaintiff presented no evidence that Hayes and Sobieray made meritless complaints about Plaintiff's performance when they were allegedly monitoring Plaintiff. Moreover, many other co-workers beyond Hayes and Sobieray complained about Plaintiff's poor work performance, including Stapleton-Zehnder, Roland, McInnis, Massoglia, and Roditcher. Plaintiff identified no further evidence that any of these employees were also close to Tokarski, PageID.561, or that their complaints were not based in fact.

Therefore, Plaintiff has not met her burden in showing that Defendant's reason for her termination had no basis in fact.

**2.**

Plaintiff next contends that Defendant's proffered reason for her termination is pretextual because it is insufficient to motivate her termination. Plaintiff first argues that she "satisfied all performance requirements and received *only* positive reviews. Yet, Tokarski testified that she has never disciplined any employee for simply having an attitude problem." However, Plaintiff's evaluations do not fully encompass her performance. While Plaintiff may have demonstrated proficient skill in certain procedures, the reviews do not preclude the possibility that Plaintiff had other performance and conduct issues apart from executing the procedures. The record shows that several co-workers expressed complaints about Plaintiff's performance and conduct. She was not terminated solely for having an attitude problem. In fact, her termination letter provides evidentiary support for the notion that she was fired for more than just an attitude problem, stating that she was fired in part for her failure to follow instructions.

Moreover, Tokarski's inability to recall another probationary nurse who was terminated for reasons similar to Plaintiff does not render Defendant's proffered reason for Plaintiff's termination insufficient. To prove that the employer's proffered reason for the decision was insufficient to motivate that decision, a Plaintiff may present "evidence that other employees, particularly employees not the protected class" were not terminated "even though they engaged in substantially identical conduct to that which the employer contends motivated" the termination. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The fact that Ms. Tokarski's could not recall another nurse terminated for reasons similar to Plaintiff does not satisfy Plaintiff's burden because there is no evidence that a similarly situated employee ever engaged in the same conduct as Plaintiff.

Lastly, Plaintiff vaguely argues that Defendant's proffered reason for termination is insufficient because "Defendant utilizes progressive discipline" and "Plaintiff's termination was

the first disciplinary action ever taken against her." However, mere acknowledgment of a progressive discipline policy within the VA does not alone corroborate Plaintiff's contention that Defendant's proffered reason for Plaintiff's termination was pretextual. Plaintiff does not provide evidence that she, or even probationary employees as a collective group, were subject to the policy. Even if Plaintiff was subject to the policy, she provides no evidence describing the progression of discipline and how, despite several complaints and counseling from Tokarski about her performance, Defendant deviated from the policy by terminating Plaintiff. Without such minimal information, Plaintiff is unable to establish that her conduct was insufficient to motivate her termination.

Plaintiff is unable to meet her burden in showing that Defendant's proffered reasons for her termination were pretextual. Accordingly, Defendant is entitled to summary judgment on Plaintiff's racial discrimination claim.

### IV.

The *McDonnell Douglas* burden-shifting framework also applies to Plaintiff's retaliation claim. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).

### A.

To establish a prima facie case for retaliation, the plaintiff must show that: 1) she "engaged in activity protected under Title VII"; 2) "the defendant knew that she engaged in the protected activity"; 3) "the defendant subsequently took an adverse, retaliatory action against the plaintiff"; and 4) "the protected activity and the adverse action were causally connected." *Randolph v. Ohio Dept. of Youth Services*, 453 F.3d 724, 736 (6th Cir. 2006).

The first three elements of the prima facie case are undisputed. However, Defendant challenges Plaintiff's ability to satisfy the fourth element of causation. Defendant contends that

"there is no other indicia of retaliatory conduct" beyond a temporal connection between Plaintiff filing her EEO charge and her termination. PageID.353. Defendant relies on case law that states "temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Randolph*, 453 F.3d at 737.

Here, the temporal connection is substantial enough that no other indicia of retaliatory conduct is required. The Sixth Circuit has held that a three-month period between a protected activity and adverse employment action "is significant enough to constitute sufficient evidence of a causal connection." *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 563 (6th Cir. 2004); *see also Goller v. Ohio Dept. of Rehabilitation and Correction*, F. App'x 250, 257 (6th Cir. 2008) (holding that "temporal proximity [was] enough to generate an inference of retaliation" because the plaintiff was terminated within two months of initiating her complaint). In *Singfield*, the plaintiff was terminated "just over three months after he filed a discrimination charge with the employment commission." *Id.* The Sixth Circuit concluded that the temporal proximity of three months alone was adequate to "infer a retaliatory motive" without requiring the plaintiff to show further indicia of causation. *Id.*

Here, Plaintiff was terminated on January 27, 2017. PageID.524. This was less than two months after Plaintiff filed the EEO charge on December 6, 2016. ECF No. 31-19. Therefore, the strong temporal connection between Plaintiff's protected action and her termination is sufficient to constitute evidence of causation without inquiring into other indicia of retaliatory conduct.

Even if Plaintiff was required to show "other indicia of retaliatory conduct" to establish causation, she has met this burden. Tokarski's decision to forward complaints about Plaintiff to HR only after Plaintiff filed her EEO charge generates an inference of retaliatory intent in Plaintiff's termination that extends beyond a temporal connection. Prior to Plaintiff filing her EEO

charge on December 6, 2016, Tokarski received several complaints from co-workers regarding Plaintiff's performance and conduct, which were discussed in detail above. Tokarski did not forward any of these complaints to HR. After Plaintiff filed her EEO charge and Tokarski subsequently found out about the charge on December 16, 2016, Tokarski continued to receive complaints from co-workers regarding Plaintiff's performance and conduct, which were also discussed in detail above. However, Tokarski began to forward some of the complaints to HR that she received after December 16. Furthermore, on January 13, 2017, the EEOC sent a memorandum summarizing the investigation of Plaintiff's EEO charge and asked Tokarski to participate in a mediation related to Plaintiff's claims. Between January 13 and Plaintiff's termination, Tokarski received two complaints from co-workers and one email from Plaintiff, which were discussed above. Tokarski forwarded all three to HR.

The complaints made before and after Plaintiff filed her EEO charge raise similar issues, mainly that Plaintiff was absent from her work station, inefficient in performing her duties, and resistant to criticism. In some instances, it was even the same co-workers who were expressing similar issues about Plaintiff's performance both before and after she filed her EEO charge. There were strong parallels between the complaints filed throughout Plaintiff's employment period. Tokarski's decided to forward some complaints to HR only after Plaintiff filed her EEO charge. This generates an inference of retaliatory intent in Plaintiff's termination that constitutes other "indicia of causation." Thus, Plaintiff has satisfied her burden in demonstrating a genuine issue of material fact regarding whether there is a causal connection between her protected activity and termination. Accordingly, Plaintiff has established a prima facie case for retaliation.

**B.**

Defendant previously proffered a legitimate, nondiscriminatory reason for Plaintiff's termination when challenging her racial discrimination claim (see III.B.). Thus, the burden shifts back to Plaintiff to demonstrate that Defendant's proffered reason was pretext for retaliation. Plaintiff can demonstrate pretext by showing that Defendant's proffered reason (1) has "no basis in fact", (2) "did not actually motivate the defendant's challenged conduct," or (3) "was insufficient to warrant the challenged conduct." *Hopston v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 (6th Cir. 2002).

In his motion for summary judgment, Defendant merely argues in a conclusory statement that Plaintiff "cannot show that [Defendant's] decision [to fire Plaintiff] was a pretext for retaliation." PageID.353. Unlike his other arguments contained in his motion for summary judgment, here, Defendant did not "cit[e] to particular parts of materials in the record" to support his argument that summary judgment is warranted. Fed. R. Civ. P. 56 (c)(1). Defendant has therefore waived his argument. *Cf. McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones."). Accordingly, because Plaintiff has established a prima facie case of retaliation, Defendant is not entitled to summary judgment on Plaintiff's retaliation claim.

Even if Defendant had advanced a proper argument for summary judgment, Plaintiff has met her burden in raising a triable issue of fact as to whether Defendant's proffered reason for Plaintiff's termination was a pretext for retaliation. Tokarski's decision to forward complaints about Plaintiff's performance to HR only after Plaintiff filed an EEO charge establishes a triable issue of fact that Defendant's reason for Plaintiff's termination was insufficient to motivate Defendant's decision. As discussed above, Tokarski received numerous complaints concerning Plaintiff's conduct before Plaintiff filed her EEO charge. However, Tokarski did not choose to

forward those emails to HR. Tokarski then received similar complaints from co-workers after she learned about Plaintiff's EEO charge but decided that some of those complaints were worth HR's attention. Therefore, a triable issue of fact exists as to whether Defendant's proffered reason for Plaintiff's termination was pretextual and Defendant is not entitled to summary judgment on Plaintiff's retaliation claim.

**V.**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment (ECF No. 27) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Plaintiff's Title VII discrimination claim, Count I, is **DISMISSED**.

Dated: July 18, 2019                                    s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge